```
                UNITED STATES DISTRICT CIRCUIT
                       SOUTHERN DISTRICT


              CASE NO:  10-20513-CIV-LENARD/TURNOFF

GARY JEANTY,

        Plaintiff,

vs.

CITY OF MIAMI, a political subdivision;
[OFFICER] CARLOS ATUNEZ, in his
individual and official capacity;
MIAMI-DADE COUNTY, FLORIDA, a
political subdivison of the State of
Florida; OFFICER CYNTHIA LENDORE, in her
individual and official capacity; and
OFFICER ORLANDO LOPEZ, in his individual
and official capacity,

        Defendant.
_____/


              DEPOSITION OF SGT. VINCE ATHERLY


                9100 South Dadeland Boulevard
                    Suite 1704 PH 1
                    Miami, Florida 33156
                    October 21, 2011
                    2:30 p.m.


Taken before Gredys Companioni, Notary Public in and for
the State of Florida at Large, pursuant to Notice of Taking
Deposition filed in the above case.
```

**APPEARANCES**

ON BEHALF OF THE PLAINTIFF:

    BARON & HERSKOWITZ
    9100 S. Dadeland Boulevard
    Penthouse One, Suite 1704
    Miami, Fl 33156
    BY: JON M. HERSKOWITZ, ESQUIRE

ON BEHALF OF MIAMI-DADE COUNTY:

    MARLON D. MOFFETT, ESQUIRE
    111 N.W. 1st Street
    Suite 2810
    Miami, Florida 33128

ON BEHALF OF THE CITY OF MIAMI:

    CITY ATTORNEY'S OFFICE
    444 SW 2nd Avenue
    Suite 945
    Miami, Florida 33130
    **CHRISTOPHER A. GREEN, ESQUIRE**

ON BEHALF OF THE DEFENDANT:

    JON KREGER, ESQUIRE
    8100 OAK LANE
    Suite 403
    Miami Lakes, Florida 33016

---

THEREUPON:

    OFFICER VINCE ATHERLEY

Was called as a witness, and after having been first duly sworn, was examined and testified on his oath as follows:

    DIRECT EXAMINATION

BY MR. HERSKOWITZ:

    Q   Good afternoon, Officer. How are you?

    A   Good.

    Q   My name is John Herskowitz and I represent Mr. Jeanty, and I know one of the questions that you have is why you're here. We'll explain as we get into it, but can you state and spell your full name?

    A   First name is Vince, V-i-n-c-e. Last name is Atherley, A-t-h-e-r-l-e-y.

    Q   Have you ever given a deposition before?

    A   Yes.

    Q   On a civil matter?

    A   On a civil matter once before.

    Q   On what type of case was that?

    A   For a traffic accident that happened involving two fatalities.

    Q   And you were one of the responding officers?

    A   Correct.

    Q   To refresh your recollection, if I ask you a question that you don't understand, you will let me know?

    A   Yes.

    Q   If you need to take a break for any reason whatsoever, speak to your attorney, get something to eat, go to the bathroom, will you let me know?

    A   Yes.

    Q   You have to answer everything audibly so that the court reporter can take it down. You understand that?

    A   Yes.

    Q   Have you ever been involved in a lawsuit?

    A   Yes.

    Q   As a plaintiff or defendant?

    A   Yes.

    Q   What type of lawsuit?

    A   It was actually -- I wasn't -- I was more of -- I was just like a witness. I wasn't really a plaintiff or a defendant. It was regarding the traffic accident that I mentioned before.

    Q   And do you have any family members who are law enforcement officers?

    A   Yes.

    Q   Who are they?

    A   My wife is a police sergeant with Miami Dade Police and my brother is a lieutenant with the Coral Gables Police Department.

    Q   Same last name?

Page 5

```
1    A    Yes.
2    Q    Have you or anybody in your family ever been
3  accused or investigated for a crime?
4    A    No.
5    Q    And you are obviously married. What is your
6  wife's name?
7    A    Vanessa Holdings.
8    Q    Is that Bob Holdings' daughter?
9    A    Yes.
10   Q    I represented Bob Holding.
11   A    Oh, really?
12   Q    Have you ever been involved in any type of IA
13 investigation as a subject officer?
14   A    Yes.
15   Q    How many?
16   A    Up to today, one.
17   Q    And, briefly, what did it involve?
18   A    It involved me leaving work early and not putting
19 in a slip.
20   Q    And when was that?
21   A    This was last year.
22   Q    And what was the result of the IA investigation?
23   A    I received a written reprimand.
24   Q    And who was the complainant?
25   A    The complainant was actually the major of the
```

Page 6

```
1  district.
2    Q    Your major?
3    A    Yes.
4    Q    And what was the official charge?
5    A    Falsifying my worksheet for leaving early. It
6  wasn't matching with the time, my work schedule, and the
7  time that I left.
8    Q    And what was the major's name?
9    A    Ariel Artim.
10   Q    Spell his last name.
11   A    A-r-t-i-m.
12   Q    And when you fill out a worksheet, how does that
13 work?
14   A    It's a daily activity report that you have to
15 fill out the times, whatever calls you respond to or
16 wherever it is that you are at, you have to put the exact
17 time and the location that you're at.
18   Q    Okay. And then how did they match that up to
19 see?
20   A    They match it up with the computer, the CAD
21 system.
22   Q    And this daily activity report, is this something
23 that you swear to?
24   A    No, it is just your report that you fill out,
25 when you work uniform patrol, you have to fill it out every
```

Page 7

```
1  day.
2    Q    And as part of the investigation, did you have to
3  give a statement?
4    A    Yes.
5    Q    Did you admit that your worksheets were not
6  entirely accurate?
7    A    Yes.
8    Q    And your admission, was that part of an agreement
9  to just take some discipline and move on from it?
10   A    I just -- I admitted to it because I wasn't going
11 to lie and say that I didn't do it, so.
12   Q    And what was the discipline that you received?
13   A    Written reprimand.
14   Q    Can you give me the benefit of your education and
15 your employment history, please?
16   A    I graduated from high school in '95 and then I
17 did a year and a half of college at Miami Dade Community
18 College and I applied before that with the police
19 department, so halfway through Miami Dade College I got
20 hired, so I went into the police academy.
21   Q    Where did you go to high school?
22   A    Miami Sunset Senior High.
23   Q    And did you apply to any other departments other
24 than the county?
25   A    For FHP but I never got as far as -- all that I
```

Page 8

```
1  did was fill out the application. I didn't do any
2  background test or anything like that.
3    Q    When did you start with the county?
4    A    In '98. November of '98.
5    Q    So you went from high school to Miami Dade,
6  straight to the county, and you have been there ever since?
7    A    Right.
8    Q    And what positions have you held with the county?
9    A    Mostly uniform patrol, and I also did two years
10 with the environmental investigation unit and two years
11 with the training bureau as a training advisor. And the
12 rest has all been uniform patrol.
13   Q    And are you currently a sergeant?
14   A    Yes.
15   Q    When did you become a sergeant?
16   A    In November of 2005.
17   Q    And in the training bureau, what type of -- tell
18 me what you did in the training bureau?
19   A    I was a training advisor, so I was in charge of
20 one of the police academy classes. Myself along with
21 another training advisor, we supervised about 25 to 40
22 police trainees for a period of six months until they
23 graduate, so you're basically a supervisor but you're an
24 officer. You supervise the police training.
25   Q    As a sergeant, what are your responsibilities
```

Page 9

1 now?
2  A   I supervise a squad of seven police officers,
3 basically, to make sure that they are doing their job,
4 going to calls, handling their calls, turning in their
5 paperwork.
6  Q   And are you out on the street?
7  A   Yes.
8  Q   And are two of those officers, Lopez and Lendore?
9  A   Currently Lopez still works for me because we
10 both transferred to a different district, but Lendore, she
11 is in south district. I am currently in the midwest
12 district.
13 Q   In March of '08, you were supervising seven
14 officers?
15 A   Six to seven.
16 Q   Same responsibilities as the sergeant,
17 supervising and making sure that they were going where they
18 should be?
19 A   Right.
20 Q   The officers you're supervising, prior to them
21 making an arrest or after they make an arrest, do you
22 review or confirm the facts of the arrest to ensure that
23 they established probable cause?
24     MR. MOFFETT: Object to the form. You can
25 answer.

Page 10

1  A   Okay. We usually just check it to make sure that
2 it is filled out properly and has the basic, you know,
3 necessary information.
4  Q   You are talking about the A-form?
5  A   The A-form, the arrest form.
6  Q   Do you review the A-form to make sure that
7 probable cause exits in the A-form?
8  A   Yes.
9  Q   And that's a policy of Miami Dade Police
10 Department?
11     MR. MOFFETT: Object to The form.
12 Q   (By Mr. Herskowitz) Is it also a Florida law that
13 the facts within the A-form must be probable cause for the
14 charged offense?
15     MR. MOFFETT: Object to the form.
16 A   Yes.
17 Q   And that's how Miami Dade officers are trained?
18 A   Well, that's --
19     MR. MOFFETT: Object to the form.
20 A   That's pretty much how -- you just make sure that
21 the PC is there to match the charge.
22 Q   Now, on Exhibit One, which is an A-form with Mr.
23 Jeante, is that your notary?
24     MR. MOFFETT: Objection to form.
25 A   That is my signature, yes.

Page 11

1     MR. HERSKOWITZ: What's wrong with the form?
2     MR. MOFFETT: Lack of predicate.
3     MR. HERSKOWITZ: That that's his signature?
4     MR. MOFFETT: You said is that your notary.
5  Q   (By Mr. Herskowitz) Is that your signature?
6  A   Yes.
7  Q   Did you notarize the paperwork?
8     MR. MOFFETT: Object to the form.
9  A   It's just a signature. I am not a notary public.
10 It says a brief thing there about a notary, but I am not a
11 notary public. That's just the way that it is worded on
12 the arrest form.
13 Q   Why did you sign this arrest form?
14 A   Basically, because what I read on there, it
15 matched the charge that he -- what he wrote in the
16 narrative, it matched what he charged the person with, the
17 defendant.
18 Q   Let's go back, actually. Why do you sign these
19 A-forms under the notary portion?
20     MR. MOFFETT: Object to the form.
21 A   It is part of -- that's where the supervisor is
22 supposed to sign it and they won't accept the prisoner in
23 the Dade County Jail unless the supervisor has signed.
24 Q   So that I understand it, are you trained by Miami
25 Dade Police that as a sergeant or supervisory officer you

Page 12

1 are to sign the A-form?
2  A   Yes.
3  Q   And you are signing the A-form after reviewing
4 the A-form to make sure that everything is filled out
5 correctly?
6  A   Right.
7  Q   And to also make sure that the factual scenario
8 is probable cause for the charged offense?
9     MR. MOFFETT: Object to the form.
10 A   Just to make sure that what is written in here
11 matches what the charge is.
12 Q   So whatever is written in the factual portion are
13 the elements--
14 A   To the crime that they're charging.
15 Q   So what you want to make sure is that each
16 element of the crime charged is discussed in the factual
17 portion?
18 A   Right.
19 Q   And you are trained by Miami Dade Police to do
20 this and to sign the portion that requires the notary?
21     MR. MOFFETT: Object to the form.
22 A   I would say -- I wouldn't call it trained. That
23 is just part of our job as a supervisor to sign it, but
24 there is no specific training course that we go to.
25 Q   But you are instructed as a superviser to perform

13
1  these functions and then sign the arrest affidavit in this
2  section as you have done in Exhibit One?
3      A    Right.
4      Q    And in this section that you have done in Exhibit
5  One says, "Sworn to and subscribed before me," and it
6  requires a notary; is that correct?
7           MR. KREGER: Object to the form.
8           MR. MOFFETT: Object to the form.
9      A    I wouldn't say a notary. It's just a signature.
10 It does say notary on there, but as a police officer, I am
11 not a notary public, because then that would entail that I
12 would have to have that certification.
13     Q    Let me ask you this. Let's do this step-by-step.
14 This section reads as it requires a notary signature, is
15 that correct?
16     A    Yes.
17          MR. MOFFETT: Object to the form.
18     Q    As a sworn law enforcement officer, are you
19 permitted notarize or affirm the A-form?
20     A    We are to sign it, but I wouldn't call it a
21 notary.
22     Q    Okay. Is it required that an a-form be sworn to
23 by the officer who is writing the facts of the charged
24 offense?
25     A    Meaning that we would have to be there when the

14
1  officer is there?
2      Q    When you make an arrest and you sign the A-form
3  and then a supervisor signs it, you as the arresting
4  officer are swearing that the facts in the A-form are true?
5      A    Yes, I am going along with what the officer wrote
6  on it.
7      Q    Let's take a step back. Forget this A-form.
8  When you make an arrest and sign the A-form as the
9  arresting officer, you are swearing that the facts
10 contained in the A-form establish probable cause for the
11 charged offense?
12     A    Correct.
13          MR. MOFFETT: Object to the form.
14     Q    Now, with respect to Mr. Jeanty, did you go to
15 the scene?
16     A    No.
17     Q    Did you ever meet Officer Antunez?
18     A    No.
19     Q    Did you ever speak with them?
20     A    No.
21     Q    How did you come to sign this document?
22     A    The officers that work for me, Lendore and Lopez,
23 they called me and told me that they were transporting a
24 prisoner for the officer, and they needed the arrest form
25 to be signed because there was no other supervisor in that

15
1  area. It was only me, so I told them to meet up with me
2  and I signed the arrest form.
3      Q    Now, are you familiar at all with the mutual aid
4  agreement?
5      A    Somewhat, yes.
6      Q    Tell me what are you familiar with with respect
7  to that agreement?
8      A    Basically, if another officer is in another
9  jurisdiction and they see something, a crime or some kind
10 of, you know, infraction takes place in front of them, and
11 they are in a marked police car, they have a duty to act.
12 If they take action, like in this case he did, us as the
13 Miami Dade Police Department, we are supposed to assist
14 them, by, you know, helping them with whatever they need to
15 effect the arrest, which is that we transported the
16 prisoner for them.
17     Q    What are you doing by signing this document?
18          MR. MOFFETT: Asked and answered.
19     A    Basically just saying that whatever is written on
20 there matches this, that it is completed properly.
21     Q    You are saying that the document is completed
22 properly by signing it?
23     A    Yes.
24     Q    And you are also saying that the facts as recited
25 in this narrative are the elements of the charged offense?

16
1      A    Yes.
2      Q    What are the elements for the arrestable offense
3  of an expired tag?
4      A    I believe that it has to be six months or more.
5      Q    Greater than six months?
6      A    Yes.
7      Q    And it has to be the second offense?
8      A    Right.
9      Q    So, if in this arrest affidavit, it was either
10 one offense or it was less than six months, it would not be
11 an arrestable offense; is that correct?
12          MR. MOFFETT: Object to the form.
13     A    Right.
14     Q    Okay. And what would happen if you did not sign
15 this?
16     A    If I refused to sign it?
17     Q    Yes. "I didn't see it. I didn't meet the
18 officer. I don't know him. I'm not signing."
19          MR. MOFFETT: Object to the form.
20     A    Then another supervisor would have to respond or
21 meet one of the officers and sign it.
22     Q    What did Lopez or Lendore tell you about Mr.
23 Jeanty and what occurred?
24     A    They basically just told me that they, you know,
25 they responded as back-up officers to assist him and that

17

1  he was making the arrest of Mr. Jeanty, and that they were
2  going to transport him, I believe it was to the station
3  that they met up with me and for me to sign the arrest
4  form. They didn't really give me too much more description
5  than that.
6     Q    Have you spoken to them about this case?
7     A    They briefly mentioned -- actually, I only spoke
8  with Lopez because he works for me now, and he just
9  mentioned to me that he had a depo for this case and if I
10 recalled anything and I said honestly I don't remember much
11 because I didn't really have any interation with anybody,
12 except when I met up with them to sign the arrest form.
13    Q    Okay. Are you aware that the mutual aid
14 agreement requires the officer from the arresting
15 jurisdiction, in this case Miami Dade County to complete an
16 arrest affidavit?
17        MR. MOFFETT:  Object to the form.
18    A    No, I wasn't aware of it.
19    Q    In this case, where it was a City of Miami
20 officer outside of his jurisdiction, but in Miami Dade
21 County, who do you believe is the arresting officer?
22    A    In this case, I believe the City of Miami
23 officer.
24    Q    Do you know whether that City of Miami officer
25 possessed the authority to make the arrest outside of the

18

1  City?
2     A    As far as my understanding because of my
3  understanding of the mutual aid agreement, I believe that
4  he did.
5     Q    How did you gain your understanding of the mutual
6  aid agreement?
7     A    Just from discussing it with other officers, and
8  I mean, I believe that they did put out a few legal
9  bulletin notes from our Legal Department.
10    Q    When officers are dispatched, what's a signal 34?
11    A    It's a disturbance.
12    Q    Is it an emergency?
13    A    If it just goes -- if it is dispatched as just a
14 34, then it is not an emergency. If it has a two in front
15 of it, then it would be an emergency.
16    Q    That was my question. What is meant by a
17 disturbance, typically?
18    A    Usually, two people having an argument. It could
19 be a number of things -- a barking dog, loud music in the
20 neighborhood.
21    Q    And when someone calls into Miami Dade by
22 dispatch or by phone, they are recognized as the
23 complainant, meaning the person making the call?
24    A    Correct.
25    Q    And they, as part of the dispatch, they try to

19

1  get as much facts as possible to give to the officer who is
2  responding?
3     A    Right.
4     Q    Do you recognize unit number C-2205?
5     A    C-2205? That would be Charlie 225. That is a
6  daytime unit in Cutler Ridge.
7     Q    Okay. What about C-1306, or C-1302?
8     A    Those are midnight officers. They're from Cutler
9  Ridge.
10    Q    What were the unit numbers for Lopez or Lendore,
11 if you recall, in March of '08?
12    A    It would probably be midnight at the time.
13 Midnight shift. There are several midnight shifts.
14 There's a 10-to-6, 11-to-7, and a 12-to-8.
15    Q    Do you know whether there was any investigation,
16 any discipline or any arrest with respect to Mr. Jeanty's
17 arrest?
18    A    As far as our department, I don't know of any.
19        MR. HERSKOWITZ:  I think I'm done.
20        I don't have naymore questions.
21                    CROSS EXAMINATION
22 BY MR. GREEN
23    Q    I have some questions for you, Sergeant. My name
24 have Chris Green. I represent the City of Miami.
25        For the officers that you supervised, you would

20

1  be the person to sign the arrest affidavit, correct?
2     A    Right.
3     Q    Do you normally have them take an oath and swear
4  to the facts before you sign?
5     A    No.
6     Q    Do you stamp the arrest affidavit with a seal of
7  any kind?
8     A    No.
9     Q    This is the same form that's used by the Metro
10 Dade Police Department, correct?
11    A    Correct.
12    Q    The middle box at the bottom says, sworn to and
13 subscribed before me, the undersigned authority this is
14 blank day of blank, correct?
15    A    Yes.
16    Q    So, it's not the practice, then, to take sworn
17 testimony from an officer before you, as a sergeant, would
18 sign the arrest affidavit?
19    A    No.
20    Q    And do you require the of icers that you
21 supervise to sign in your presence?
22    A    To sign in my presence? No.
23    Q    What do you do with respect to the officer's
24 signature, the arresting officer?
25    A    By the time that I receive it to sign it, they

**Page 21**

1 have already signed it.
2  Q  I would imagine that you recognize the officers'
3 signatures if you supervised them?
4  A  Right.
5  Q  And in this particular case, you don't know an
6 Officer Antunez, do you?
7  A  No.
8  Q  And you wouldn't know whether or not that's his
9 signature?
10  A  No.
11  Q  Is there any particular reason that you didn't
12 have one of the county officers co-sign the arrest
13 affidavit?
14  A  No. Because in my understanding, they were just
15 transported.
16  Q  Okay. If I could read the bottom language of
17 that box, I think that it is says deputy of the court or
18 notary public; is that correct?
19  A  I believe that's what it says, deputy of the
20 court.
21  Q  Has there been any time in your experience where
22 this form was actually notarized or sealed?
23  A  No, never seen it.
24  Q  And at the top of the form, there's a box that
25 says MDPD, and then I can't read the rest of the line. Do

**Page 22**

1 you know what that is?
2      MR. HERSKOWITZ: Where are you pointing?
3      MR. GREEN: Right here.
4      MR. HERSKOWITZ: Record and ID number.
5      THE WITNESS: Yes, that's what it says.
6  Q  (BY Mr. Green) Do you know what that number is?
7  A  No. I believe that is a number that jail
8 personnel put on there. Once the person is already
9 processed in, they write that number in there.
10  Q  Is that number added on later, then, by
11 corrections?
12  A  Yes.
13      MR. GREEN: All right. I don't have any other
14      questions.
15              CROSS EXAMINATION
16 BY MR. KREGER:
17  Q  Just so that I am clear, where did you sign off
18 on the A-form?
19  A  Right here.
20  Q  All right. Underneath?
21  A  Underneath where it says March. That's my
22 signature.
23  Q  Okay. I think that you testified -- now, I'm not
24 going to be able to quote you verbatim obviously, but I
25 think that you testified that you received a call on the

**Page 23**

1 radio from either Lendore or Lopez about that they were
2 transporting an arrestee?
3  A  Right. They called me over the phone.
4  Q  Okay. And I think that you testified that they
5 didn't really tell you too much about the circumstances of
6 the arrest?
7  A  No.
8  Q  Do you recall what they told you at all other
9 than that they were transporting an arrestee?
10  A  All that I remember is them saying that it was a
11 City of Miami officer that is making an arrest and is
12 filling out the arrest form and they are going to transport
13 him and bring the prisoner to me so that I could sign the
14 arrest form, but they didn't give me much more than that.
15 That's all that I know.
16  Q  And then when they met up with you and presented
17 you with the A-form, they didn't have any other
18 conversation with you about the facts?
19  A  No.
20  Q  I think that you testified that you became a
21 sergeant in 2006?
22  A  2005.
23  Q  And during your time as a sergeant, have you had
24 much of an opportunity to sign off on A-forms that had been
25 filled out by an officer in another jurisdiction?

**Page 24**

1  A  As far as I can remember, this is probably the
2 first one that I've done for an officer from another
3 jurisdiction. I have signed for officers in different
4 districts within the county, like from the north end or
5 neighboring district, but as far as like an outside
6 officer, this was the first one, that I can remember,
7 because I have signed hundreds of these.
8      MR. KREGER: Sure. I don't have anymore
9      questions.
10      MR. MOFFETT: None. We will read.
11      (Thereupon, the taking of the deposition was
12      concluded.)
13              EXCEPT FOR ANY CORRECTIONS
14              MADE ON THE ERRATA SHEET BY
15              ME, I CERTIFY THIS IS A TRUE
16              AND ACCURATE TRANSCRIPT.
17              FURTHER DEPONENT SAYETH NOT.
18              _____
19              SGT. VINCENT ATHERLEY

```
                                                    25
 1
 2  STATE OF FLORIDA      )
 3                        |SS:
 4  COUNTY OF MIAMI-DADE)
 5
 6          Sworn and subscribed to before me this
 7  _____ day of _____, 2011. PERSONALLY KNOWN _____
 8  OR I.D. _____.
 9
10          _____
11              Notary Public in and for the
12              State of Florida at Large.
13
14
15  My Commission expires: August 9, 2012
```

```
                                                    27
 1                 CERTIFICATE OF OATH
 2
 3  STATE OF FLORIDA
 4  COUNTY OF DADE
 5
 6
 7       I, the undersigned authority, certify that SGT.
 8  VINCENT ATHERLEY, personally appeared before me and was
 9  duly sworn.
10       Witness my hand and official seal this 25th day
11  of October, 2011.
12
13          _____
14                  Gredys Companioni
15                  Notary Public - State of Florida
16                  Commission No. CC 811601
17                  My Commission Expires: 08-09-2012
```

```
                                                    26
 1                    ERRATA SHEET
 2  RE: GARY JEANTY v. CITY OF MIAMI, et al
 3  DEPO OF: VINCENT ATHERLEY
 4
        DO NO WRITE ON TRANSCRIPT. ENTER ANY CHANGES HERE.
 5
    Page #| Line # |Change              |Reason
 6  _____|_____|_____|_____

 8  _____|_____|_____|_____
 9
10  _____|_____|_____|_____
11
12  _____|_____|_____|_____
13
14  _____|_____|_____|_____
15
16  _____|_____|_____|_____
17  State of Florida)
18  County of Dade  )
19
20             _____
                      Notary Public
21  Under penalties of perjury, I declare that I have read my
    deposition transcript, and it is true and correct subject
22  to any changes in form or substance entered here.
23  _____          _____
    Date              Signature
24
25
```

```
                                                    28
 1           REPORTER'S DEPOSITION CERTIFICATE
 2
 3
 4
 5  STATE OF FLORIDA
 6  COUNTY OF DADE
 7
 8
 9       I, GREDYS COMPANIONI, Registered Professional
10  Reporter, certify that I was authorized to and did
11  stenographically report SGT. VINCENT ATHERLEY, that this
12  transcript is a true and complete record of my stenographic
13  notes.
14       I further certify that I am not a relative,
15  employee, attorney, or counsel of any of the parties,
16  parties' attorney, or counsel connected with the action,
17  nor am I financially interested in the action.
18       DATED this 25th day of October, 2011.
19
20          _____
21                  Gredys Companioni
22                  Notary Public - State of Florida
23                  Commission No. CC DD811609
24                  My Commission Expires: 08-09-2012
```

```
                                                    29
 1
 2
                    SONIA TOTH & ASSOCIATES
 3                     2680 Hilola Street
                     Coconut Grove, Fl 33133
 4
 5  October 25, 2011

 6  SGT. VINCENT ATHERLEY
    C/O MARLON D. MOFFETT, ESQ
 7  with the firm Miami-Dade County Attorney's Office
    Stephen P. Clark Center
 8  111 N.W. 1st Street
    Suite 2810
 9  Miami, Florida 33128

10

11
    RE       : GARY JEANTY v. CITY OF MIAMI, et al
12  DEPO OF: SGT. VINCENT ATHERLEY
    TAKEN    : October 21, 2011
13
    Mr. Lyons:
14
    This letter is to advise you that the transcript of your
15  deposition is completed and is available for reading and
    signing.
16
    Please make an appointment to come to our office to read
17  and sign the transcript. Our office hours are 8:30 a.m. To
    4:30 p.m., Monday through Friday. Depending on the length
18  of the transcript, you should allow yourself sufficient
    time for review.
19
    If the reading and signing has not been completed prior to
20  the above-referenced date, we shall conclude that you have
    waived the reading and signing of the deposition
21  transcript.

22  Your prompt attention to this matter is appreciated.

23  Sincerely,

24  GREDYS COMPANIONI, RPR.

25
```

```
                                                    30
 1
                    SONIA TOTH & ASSOCIATES
 2                     2680 HILOLA STREET
                     COCONUT GROVE, FL 33133
 3

 4  October 25, 2011

 5  JON M. HERSKOWITZ, Esquire, of the firm
    BARON & HERSKOWITZ
 6  9100 S. Dadeland Boulevard
    Penthouse One, Suite 1704
 7  Miami, Fl 33156

 8  IN RE: GARY JEANTY V. CITY OF MIAMI, et al
    DEPO OF: SGT. VINCENT ATHERLEY
 9  TAKEN: October 21, 2011

10
    Dear Mr. Herskowitz:
11
    The original transcript of the deposition listed above is
12  enclosed for your file. The witness did not waive reading
    and signing and has been sent a letter notifying them to
13  come in to read and sign their deposition transcript.

14  The witness will be provided a copy of their deposition for
    reading in our office should they come in to review the
15  transcript, and we will forward to you any corrections made
    by the witness at that time, along with an original
16  signature page to be attached to the original transcript.

17  Sincerely,

18
    GREDYS COMPANIONI
19

20
21

22

23

24

25
```